Thank you, Your Honor. Good morning. May it please the Court, Mary Larkers, appearing on behalf of the United States. This Court should reverse and vacate the District Court's sweeping declaratory judgment, which allows even dangerous criminal aliens to remain in the United States despite their final orders of removal. This Court should do so for three primary reasons. First, plaintiff's claims are barred by Section 1252G. Second, the class-wide coercive declaratory judgment runs afoul of Section 1252F1. And third, plaintiffs who all have final orders of removal lack any right to remain in the United States. So, turning first to Section 1252G. Section 1252G provides that bars any cause or claim arising from, as relevant here, any decision or action by DHS to execute a removal order. Plaintiffs here challenge the execution of their removal orders. They challenge DHS's decision to execute their removal orders while they pursue a provisional unlawful presence waiver. Under the Supreme Court precedent and under this Court's precedent, plaintiffs' claims plainly arise from the execution of their removal orders. Mary Larkers Well, we adopted this rule in Bowren, that a challenge to a discretionary decision to remove someone is barred under that but we said that 1252G does not bar review of questions of pure law going to the authority to do this removal. So, why isn't that what we have here? Well, that case is an opposite for a few reasons. First, I believe it was pre-Real ID Act. I think Right, this Court's decision... Wasn't it before, wasn't it after Bowren? What was the sequence there? Your Honor, I can't really remember off the top of my head right now. I thought Bowren was before, it was before Mopoi. I think that's right and so that's the one that controls it to the extent... Go ahead. But I think Bowren, and I'll check on during opposing counsel's argument, I think Bowren was also pre-Real ID Act. The decision here that the government believes controls is Mopoi. In Mopoi, this Court looked at the language of section 1252G and held that, read naturally, the word any means any, any cause or claim. So, this discretionary versus non-discretionary dichotomy that plaintiffs raise is contrary to the plain language of section 1252G. And we know that not only because of this Court's decision in Mopoi, but also the Supreme Court's recent decision in Patel v. Garland, where you have a similar provision that talks about any decision or action. And the Supreme Court there said again, the word any means any. And even though the government in Patel v. Garland was arguing, actually, it is limited to... This is limited. It doesn't include... It is limited to discretionary decisions. The Supreme Court rejected it. The Supreme Court said no, any means any. It's not limited to discretionary decisions. And even though that provision did have some support for the position that is limited to discretionary decisions, the Supreme Court says no. Here, we don't have the language, that corresponding language in section 1252A2BI. We have section 1252G, which is even more clear than the provision in section 1252 Patel v. Garland was looking at. This section is entirely clear that it bars any cause or claim. And any sort of exception to that would be contrary to this Court's decision in Mopoi. And contrary... Can I just ask you a hypothetical? What if on this reading of 1252G, what if we were to issue a stay of removal, and then an immigrant was removed anyway? And he wanted to come into court and say, you lack lawful authority for this removal. You would say, there's no jurisdiction for us to hear that case, right? That would be the government's position. However... Okay. That would be the government's position. However, Your Honor, courts have found that there are exceptions, that there's an exception there. And that exception there is tied to whether the removal order is valid, right? So first, whether the removal order is valid, not an issue here. The removal order is indisputably valid. That plaintiffs could argue in a case... What if there's no removal order? Same thing, Your Honor. In fact, that position, that was raised in, I believe, the Seventh Circuit's decision in Madu, where the removal order... I just got mixed up about whether the removal order applied to this specific alien or another person of his same name. There was no executable removal order. There was no removal order, so Section 1252G didn't apply. So that could present... Plaintiffs could argue that that exception would apply... Based on your textual analysis, your position would be, there is no jurisdiction for a court to enforce its own stay order. That's what you said. That's the government's position. That would be the government's position. Yes. But that does not mean that that case and this case are similar or that... I understand it's a different case. I'm just trying to test the limits of your position. And there are no limits to your position. Although, as you point out, other courts have rejected such an unlimited position. Yes. And... Right. And there are additional consequences to not following court orders, which... To include sanctions, to include monetary sanctions. So it's not that GE doesn't preclude all consequences from flowing from a situation like that, Your Honor. And certainly, it's very different from the case at hand here. We have final orders of removal that are indisputably valid, that have not been stayed by any judicial body, the immigration judge or an Article III judge. And plaintiffs say that their claim, that their final orders of removal cannot be executed. And every court of appeals to have addressed a similar question to this has said that those claims are barred, even in the face of plaintiffs seeking other immigration relief that they're entitled to. For example, in EFL, the plaintiff there was seeking relief under the Violence Against Women Act. She could have been a lawful permanent resident if she was not removed. The court held Section 1252G applies. And here, plaintiffs aren't even seeking to become... They're not even going to become lawful permanent residents at the end of this 601A process. Right? They're just seeking a waiver. They have to go through a whole other steps to become a legal permanent resident. So courts have consistently found, and in fact, two courts of appeals have already held that these precise claims are barred by Section 1252G. So there's no need to test the limits of Section 1252G in this case. The court simply needs to reaffirm its decision in Mpoy, say that any means any here. In this case, with these facts, Section 1252G bars this claim. And it would be monumental for this court to create a circuit split here on these precise claims that have already been addressed by two courts of appeals, the 11th Circuit and the 3rd Circuit Court of Appeals. Can I ask you... Well, actually, you should probably be able to move on to the rest of your argument. Go ahead. So that's the first question. If the court rules in favor of Section 1252G, in favor of the government on Section 1252G, the court doesn't need to get into Section 1252F1. But it is the government's position that the declaratory which is untethered to the facts and circumstances of each individual alien's case runs afoul of Section 1252F1. It's important to note that the government does not contend that Section 1252F1 bars all class-wide declaratory relief. And if this court is looking for a test to apply, where's the line between restraining Section 1252, restraining the operation of the statutes listed in Section 1252F1? The court can look at the case cited in the brief, Mendoza-Martinez, which looked at a similar legacy INA statute using the word restrain. The court said, well, said that the declaratory judgment there didn't run afoul of that section, but said, well, let's look at the purpose, right? Does it allow a single judge to paralyze an statutory scheme? That's a good question. It certainly does here. The declaratory judgment here is coercive. ICE really has no choice but to comply with it. If an individual alien went into court, they would only have to prove that they're a class member and they would immediately be entitled to relief. After that relief would be issued, ICE would be very arguably subject to fees. It absolutely paralyzes the statutory scheme as applied to an entire class of aliens. ICE cannot detain or remove any of these class members. Counsel, just because I know your time is so limited, I wonder if before we get to relief, we could talk about the merits a little bit. And I guess one question I have about this case, and I'm hoping that both you and your colleague can be helpful to me on this. It seems like there are two different claims floating around here. And one would be that, and I understand your argument on this point, that it is unlawful to detain and remove a non-citizen once they have initiated this process, and that the government does retain the right to remove people despite the fact that they are in this application process. And I understand your argument on that point, but there seems to be another claim floating around, which is more like the government is, what the district court talked about is a luring claim that the government is not picking you up and removing you despite the fact that you are in this process, but they're actually doing it because you're in this process. Once you start this process, that's when they target you. They go to your proceeding in the USCIS building, and they pick you up at your interview. And those seem like two distinct claims to me. And I would be interested in your view as to which of those claims is in front of us, what is happening here? Well, you're right. The district court didn't really differentiate those claims very well and certainly didn't differentiate the relief based on each one of those claims. But regardless of how the claim is characterized, it's all governed by the text of the regulation, right? So as long as there is no limit on ICE's ability to take enforcement actions against these class members here, as long as the regulation doesn't limit that, as long as there's no mandatory language limiting that, then that's the question. So even if the allegation were and there were proof of this, that the day you start this application process, if you start the application process, ICE will remove you from the country, that that would not present an ACARDI problem, a due process problem that the government is holding out a benefit. But if you attempt to obtain it, they will take coercive measures against you. That seems like an ACARDI problem. Well, it's not an ACARDI problem here, right? No, but I guess I'm asking you a hypothetical. And so if those were the facts, would that be an ACARDI problem? Not here, Your Honor, because as this court recognized in Lobo v. Miller, this whole sub salientio argument, this whole allowing the regulation to become nullified, doesn't work with this specific regulation here. And importantly, Your Honor, the individuals that were arrested at USCIS, USCIS did adjudicate the application, the pending I-130, the reason why they were there. So USCIS didn't depart from any sort of alleged duty to adjudicate their application. I think in the context of the form I-130, which is the reason why they were there at USCIS, that would be a problem because the I-130 has different requirements. So I'm just trying to get a handle on kind of the ACARDI argument. So in your view, the government could have a program where say it gives out social security benefits and you don't have, that's not a good example, just some program where it gives out benefits in which you don't have a protected property interest. This is purely discretionary. It's a prize for the best essay contest, best essay written by an immigrant. But it turns out if you submit an essay, you will be removed from the country. That doesn't, in your view, raise any kind of ACARDI problem where you hold out a benefit, but then take course of measures and snatch it back, effectively nullify it? No, no, Your Honor. Again, we'd have to look at the text of that regulation, but like that's what this hinges on. That's what this court said in Lovell v. Miller that it hinges on. And this court in Lovell v. Miller did address all those arguments that plaintiffs have made here, including the nullify, including the language about will adjudicate, including the Federal Register contextual arguments. All those arguments were made here and said that USCIS doesn't even have a duty to adjudicate these applications. So how does ICE is not able to remove those aliens? But Lovell was explaining why there's not a protected property or liberty interest, and I guess I'm asking a different question. Even if we assume that that's the case, you don't have any protected interest in winning the essay contest. I guess I'm a little bit surprised that it's the government's position that they could say, well, I'm setting up an essay contest, best essay written by an immigrant high school student. And then once you submit the essay, you are immediately removed from the country because you have to put your address at the end of the essay. I mean, maybe the government's position is, no, that's cool. That's not a due process problem. It's not an Accardi problem. But I think that's a bit of a stretch. I'm not sure it's necessary for you to take that position in the case, but it's your argument. Your Honor, sorry, I see my time is up. I don't think that that's just a necessary question for the government to address here. That seems like a better answer. It is. The question is always, what does the text of the regulation say? It's a highly specific question. We believe it's a question that's squarely and clearly answered here and also supported by this court's decision in Lovo. We don't have to go into these scarier, stickier hypotheticals to reach the very narrow question here. And that's all the government is asking is for this court to address the narrow question here, which we believe is clear. Thank you. All right. Thank you. Thank you, Mr. Barikos. Mr. Abrams, we'll hear from you. May it please the court. Michael Abrams on behalf of Plaintiff Appellees. DHS enacted this stateside waiver process for people with a pathway to legal residency, their husbands and wives of U.S. citizens, their mothers and fathers to U.S. citizen children. The express purpose of the rules is to prevent family separation and encourage lawful status. Yet under a new administration, DHS began detaining and removing applicants who had encouraged to come forward at the very first step, the I-130 spousal interview. That new process exploited the waiver process to carry out enforcement operations, an opposite purpose, which undermines the benefits conferred by the binding rules. That policy reversal is the heart of plaintiff's claims. The district court correctly found straightforward violations of the APA and due process. To start with Lovo. Can I ask you a question? The notion that they are exploiting the process. I think this is something. Is this akin to what the district court was capturing with the luring kind of phraseology? The bait and switch. Luring. Yes. Okay. So my concern is the factual predicate for that claim, because I mean, I know there was no real discovery in this case, and we're doing this all on the papers, but all we have from the government is this admission that ICE has a practice of arresting, detaining and seeking removal at U.S. CIS offices on a case-by-case basis. But they're not admitting that they target people for removal because they have entered this process. They're not admitting that they're luring anyone. This admission would be just as consistent with, you know, if we have already targeted someone for removal and we think this is going to be the safest place to take them into custody, we may do that. But I'm concerned. Tell me what we know about the factual predicate for the, I'll just call it the luring claim. The facts are undisputed. They are that the waiver process encourages applicants who have thus far been discouraged from obtaining legal status to come forward. And the first step in the process is that interview. And it's undisputed that eligible applicants who came forward at that interview were then detained and put into the removal process. And it's also undisputed that many other eligible applicants were then chilled from participating based on advice from counsel, based on notice that this process was happening. And across the District of Maryland, the process was interfered with as a result. So that's the factual premise of this case. And it's the interference with the ability to apply that the district court founds effectively nullifies the rules. And I think because the rules encourage people to come forward, that's the. Why do you say it encourages? I thought it provides some latitude to allow people to seek the waiver and avoid the long time periods under the standard procedure. But and a person can decide to do it or not do it. And that person has to pursue the waiver and do it. But the statute stands that we have an order of removal there. The old process takes a lot longer. You know, in other words, your argument seemed to depend on the fact that the waiver process was a device adopted to look to encourage you use the word courage. The district court use law or more people into a process which would then facilitate their removal. And I'm not sure you get that from just the face of the regulation. There are no facts outside that your argument derived solely from the fact that the regulation exists and the and the waiver possibility is offered. Your Honor, the regulations don't exist in a vacuum. In 2013, DHS was solving a policy problem. And when you read the rulemakings, which are binding on the agency, they explain the policy problem they're solving, which is that there are undocumented people who could obtain legal status, but they're not because they'll be subject to family separation. And these rules are designed to solve that problem. That necessarily means that the mechanism for solving it is going to result in those people coming forward. There's a cost benefit analysis in the rulemaking that anticipates 100,000 applicants who are eligible for legal status who were not applying previously and now would apply. So I don't think the court should interpret the rules such that they're a dead letter, that they were just enacted and they're in a contextless purpose. There was a which was for people to apply. And the first thing you need to do to apply is for the U.S. citizen to file an I-30 petition. And often there's an interview required. Then when you come forward to that interview, you're put into removal when the whole purpose of coming forward to that interview was to obtain legal status. That was what this waiver process was for. Again, just on the factual predicate. So we know that some immigrants, when they come forward, were detained at their I-30 interviews. Do we know that all of them were? No, all of them were not. Some were and others were chilled. And they're, again, undisputed. They put forward declarations that they were told by their immigration lawyers that people who are coming to these I-30 interviews who are eligible for the waiver are being put into removal nonetheless. And they decided not to come and not to participate in this process based on that new practice that DHS was engaged in after enacting these rules. It's, I think, helpful to zoom out to the state of the law prior to the rules, which is that this waiver existed. Congress created the waiver. But to even apply, you had to depart the United States. And it could take months for your application to be resolved. You would trigger the inadmissibility bar either way when you leave the United States. Was there a question, Judge King? I'm sorry. Prior to 2013. Prior to 2013, prior to these rulemakings, you had to depart the United States to apply. And according to DHS itself in the rulemakings, it could take over a year for DHS to resolve your application. So even if your waiver was going to be denied at DHS's discretion, you'd be subject to family separation for a year while your application was pending. And then the inadmissibility bar would kick in. So the regulatory benefit that's being conferred here is not necessarily that you're going to get this waiver. The plaintiffs are not claiming they have a right to the waiver. Their claims do not go to the ultimate merits of their waiver applications. And the remedy the district court granted does not go to whether they will ultimately receive waivers. But it's the ability to apply while remaining in the United States. That was the benefit conferred. And it's a benefit on the applicants as well as the U.S. citizens who are their children and their family members. The rules explicitly are saying this is a benefit for U.S. citizen family members to not be deprived from a source of income and from family togetherness. And so that was prior to 2013. These rules changed that in 2013 and 2016. You can stay in the United States and you can apply. They say that explicitly. The applicant may remain in the United States with his or her family until the applicant must depart for the visa counselor interview. That's the last step in the process. So if the answer is that the government can, in fact, just remove you when you show up for the process because you have a final order of removal, then it renders the APA kind of toothless here. These were notice and comment rulemakings. They were weighed in by immigration lawyers, by advocacy organizations. Immigration lawyers gave advice to clients based on these rulemakings. They have the force of law. And the agency threw them out the window when it began to detain and remove the people it said could remain in the United States while they applied. So that, I mean, I asked your colleague this question, too. It seemed like sometimes the district court was saying the problem here is that an immigrant is removed during the application process, period. And sometimes the district court was saying the problem is that they are removed at these interviews at the USCIS building. But your position is more the former, right? It doesn't really matter where they were removed. I'm sorry, where they were picked up to be removed. Would your position be the same if the people who were actually detained at their interviews, instead of being detained then, they went about their business and two weeks later, they were removed? Would that change? I'm going to answer that question, Your Honor. But I want to answer the question you posed to counsel as well. Are there two distinct APA violations? I would say the way this case was presented, the APA violation that was presented is the arrest at the I-130 interview, which presents the clearest ACARDI violation. It prevents the clearest APA violation. But the remedy the district court issued to remedy that injury, to remedy that violation, is to protect the process in general because of, I mean, two things. One, there's a practical line drawing issue. If I just protect the interview, you can be removed when you get home from the interview. And it's the same effect. And also because the regulatory process in general, that benefit is remaining in the United States while your application is being considered. So could there be another case where there's a different policy of removing applicants at a You know, instead of the I-130 interview, the government could make a list of everyone who submitted an I-601A application and remove all of them. That would also have the effect of you applied for this benefit that we promised, and then we removed you instead of you receiving the benefit. But the violation that is presented in this case is the I-130 interview. And that's what was remedied. On 1252G, the government's argument is overbroad. The Supreme Court has said in AADC and in Jennings that it is not a general jurisdictional limitation on all claims related to deportation proceedings. The Supreme Court has said that would lead to staggering results. And I think there's a really clear analogy here if you think about the DACA program and the Supreme Court's landmark decision in DHS versus Regents of University of California, right? That's a prior administration had created DACA. The next administration rescinded it by memo litigation results. And the Supreme Court considers 1252G in that case. The government says everyone who benefits from DACA is removable. And so this can't be litigated in the district court because 1252G. The Supreme Court easily says this is an APA case. They're challenging the rescission of the policy, and that can be brought in the district court. It doesn't go to the mere execution of a removal order. It's the same thing here. They're challenging the issue. The argument is that they undermined the APA, and that comes in the district court. In fact, it would be worse here if the government, instead of trying to rescind the policy, which the government has the right to do, it just starts removing people, contrary to its past regulations. And then let me ask, you know, you have various components in making your argument. Where in the statute or regulations is there an exception to the removal process? In other words, this waiver does not constitute statutorily or regulatorily an exception to the right to remove. You're sort of bridging this gap with a lot of assumptions that they're targeting a policy, but I'm trying to figure out where the policy is. I'm trying to figure out where the illegality is, where the lack of discretion is. I mean, don't we have to start with the statute and the regulations on their face? And if you have facts, take it out. But you're arguing basically from the face of the documents and the fact that they're being arrested at a place that's convenient to arrest them. But you're imputing motives and you're imputing exceptions and you're imputing that the process can't go ahead. There's no exception. The argument here is not that it's an exception to removal. And I would point out, it's not a stay for removal either. No, it's not. Every applicant here can be removed. In fact, they will execute their removal orders necessarily to obtain an immigrant visa at some point, or the government can deny their applications for the waiver and then the government can execute the removal orders. But the core text here, when we talk about the face of the document that provides the APA violation, is the rulemakings. This is an APA case. The government had to give some explanation for taking a new policy. It's arbitrary and capricious to create a regulatory waiver. What's the new policy? The new policy is arresting and detaining eligible applicants for a provisional waiver at their I-130 interviews. And where is that policy found? It's found in the practice of DHS starting in 2017, which is undisputed in this case. So you're now focusing on a practice rather than a policy. We have no evidence that there's an actual policy there. They say they'll arrest them wherever they can get them. In connection with the waiver process, they make those decisions on a case-by-case process. I mean, candidly, that's what's in the record. That's the finding in this case. It's the finding of the district court that there's a practice. And DHS never disputes that. It's not disputed in the district court. It's not disputed on appeal. What exactly do you think? I thought they were not disputing. I really had struggled with this because it's like a moving target in this case. I thought they were not disputing that just because someone is in this application process, they may well remove them. They do not treat being in this application process as a shield against removal. And moreover, they have not disputed that sometimes they arrest and detain people at USCIS offices on a case-by-case basis. But that's all I see them not disputing. You think that they are admitting that they use this application process as a way to that they target people for removal because they are seeking these provisional waivers? It's not essential to the claim, this idea of intent. It could be trapping and luring, even if it's random, that they're capturing eligible applicants at the I-130 interview. Because the prior policy, the rulemakings, is that we have applicants who are not coming forward. And because of these rulemakings, now they are going to come forward. So the crux of your claim, it really is a very location-specific claim. The only thing you are challenging is picking people up at their I-130 interviews. And then the district court created prophylactic relief around that. But the core claim here is that picking people up at the interviews, that's the problem. That's what happened. That's how this case presents factually. But I guess, are you arguing this or are you not? Here's a proposition. Is this your position? It would undermine, nullify this regulatory regime if people could be removed while their application was pending. And therefore, people should not be removed. It is unlawful under some combination of the APA and other provisions to remove an applicant while they have a pending application for a provisional waiver. I believe that that is what the district court held. And I'm trying to figure out whether you are defending that part of the ruling or not. The answer is yes. And in the alternative, we don't have to. The answer is yes, I think the district court did hold that. I think that is correct. But I can imagine a different case in which evidence shows that there's not a policy or practice of interfering with the application process in general, but a single plaintiff has an execution. The APA or the Constitution? It's equivalent under ACARDI or the APA. I think the procedural due process liberty interest is a bit distinct and is kind of further afield. But the ACARDI and the APA violation are essentially equivalent. And they're all in the alternative. They all support the declaratory judgment equivalently. But to finish my answer to Judge Harris, I would say that in theory, there's a way in which we're not saying necessarily the waiver process is a shield to removal, writ large, inherently. I agree that's not in the text. But if there's a policy or practice of denying access to the process, that violates the APA. That's a change in policy because you said that people could stay in the United States and apply for this waiver. So in a different case, if there was evidence that the vast majority of people do have access to the process and the policy has not been changed, that would be a harder case for a plaintiff to come forward and say, well, I was removed and that should not have happened. But here, it was undisputed that interference was happening. That plaintiffs did not have the right to apply to the process. They were chilled from participating. That those who were removed were separated from their families while they applied. And to be clear, the I-130 stage is before you've even submitted your application. So you'll now be subject to the waiver bar without the chance to apply for your waiver in the United States, which is exactly what these regulations, the benefit they were intended to confer. So that's what happened here. And there could be a different case, but it's the district court did not err in finding that the regulatory process was being interfered with and then protecting the process writ large. So that's your APA claim? Yes. And the Acardi violation is essentially the same because it's relying on the regulations and then the regulations being violated. Well, I thought you just said the regulations did not violate it. It arose out of a practice. In other words, I have not been able to find a policy for Acardi that has been violated. Nothing in Section 217 or in the statute seems to support a notion that the government was violating the regulations. I don't think there's a practice that you contend is high-handed because ICE facilitates its removal process by being able to know where the non-citizen is when they're at the interview, and they use that to pick them up. But in terms of a policy, I asked you a couple of times where the policy is, and you keep talking about it's a practice and I don't understand what the practice is. You say it's not uniform, they don't do it for everybody, and then you agree that they do it on a case-by-case process, and then my question is, well, what governs those decisions? What if one person happens to be a pretty serious criminal and they target him? And what if the other person that they don't target happens to be somebody that has been here for a long time and paying taxes and is working? In other words, where is the policy that we're talking about in this case that supports an APA violation? I'm out of time. I'd really like to give a full response to that. Yes, please. Go ahead and answer. In the absence of a written policy or written action, the government should not be in a better position under the APA. And if this is only a problem analytically for a party, frankly, as a matter of constitutional avoidance, the court can affirm solely on the APA because it gives the same relief and it supports the declaratory judgment. But the government should not be in a better position if it can rescind a prior rulemaking by just enforcing it to the contrary. It's not rescinding anything. It hasn't rescinded anything. It is executing removal orders by arrest at these interviews. Now, that's not rescinding anything. The effect is adverse to the non-citizen. And there is some question of how useful is the waiver privilege. But you're talking about a policy which we can't even articulate the terms of the policy. I think that way of looking at this case renders these two final rulemakings entirely meaningless. And if we think about DACA, instead of rescinding DACA, the government could just remove DACA eligible participants and say, well, there's no new policy. We have discretion to remove anyone who's removable. And it doesn't matter that we enacted that. It's apparent and conceded that not everybody that attends these interviews is arrested. That's not the facts of this case. The facts of this case was that there was 100 percent. You're saying 100. You're not arguing that 100 percent of the people that go to I-30 interview are arrested and deported. And the question is, why? What is the basis for distinction? And and I'm not sure what you're saying, what the policy is and what the government is distinguishing. But the privilege of a waiver is just that it does not affect the removal order and it doesn't reflect the fact that the arrests are being conducted to execute a removal order. It's undisputed that the government was removing people at I-130 interviews who are eligible for this process. They have a pathway to legal residency. The government has never disputed that. The government didn't even say that's just a fact. That's just a factual question. It's a fact. It shows a change in practice. And the government had to give an explanation under the APA. It had to be challenged for its explanations that had to justify a change in policy. And that could be litigated as arbitrary and capricious or sufficient. The government could also have denied waiver applications. The one thing the government couldn't do is treat the last administration's rules as if they didn't exist and remove people contrary to them. And that's what happened here. Respectfully, I asked the court to affirm and I thank the court for its questions. All right. Thank you, Mr. Abrams. Ms. Lurakis. Yes, your honors. Thank you. 1252G, I did confirm Bowron was pre-Real ID Act. That is relevant because in Bowron, the court found an exception for a habeas case, raising a legal challenge. And before 2005, 1252G did not clearly bar habeas challenges. After 2005, 1252G clearly barred habeas challenges. That gets rid of Bowron because Bowron only found that the habeas challenge was survivable under G because pre-Real ID Act, G didn't clearly deprive the court of jurisdiction over habeas challenges. So Mpoy applies, not Bowron. 1252F1, this court can look at Judge Fuentes' dissent in Ali v. Decker. That sums up the government's position. We think the declaratory judgment is sweeping, broad and violates 1252F1 under the dissent by Judge Fuentes and Ali v. Decker. So the court can look at that and also the Mendoza case from the Supreme Court. On the injunction, if this court finds that there's an issue, that the only issue with the government's practice here is the arrest at USCIS, the injunction is way too broad. If that's the APA, if this court finds that there's some sort of violation which the government does not concede, because it all goes back to the mandatory language of the regulation that doesn't exist. But if the court thinks that that's an issue here, then the injunction is too broad and the court has to reverse and vacate because it doesn't just limit ICE's ability to arrest at USCIS It's also completely untethered to how even ICE learns of this information, which goes to where's the line, right? And the government's position, the clear position based on decades of Supreme Court precedent and this court's own precedent in Lovo is you have to look at the language in the regulation. Does anything in the regulation prohibit ICE's actions? Does anything in the regulation have a prohibitory effect on ICE's actions? And when looking at the Kentucky case from the Supreme Court, where the Supreme Court held that if you're going to limit, if an individual is going to say that by regulation the agency's discretion is limited, that has to be clear in the regulation. So that's what we have here, right? Does this regulation clearly limit ICE's discretion to take enforcement actions? It does not. In fact, when we look at the contextual clues, it does the opposite, right? Because in 2013, it says it doesn't give legal status, doesn't provide a stay, and it doesn't provide a stay. Then in the form I-601A instructions that are still valid today, it says that you can't expect not to be removed from the United States. So I'm sorry to interrupt, but I'm always an eye on the clock, so I apologize. So we've been debating sort of what is the policy, what is really happening here, and you may not be in a position to answer this question, but are you in a position to tell us whether the government is targeting people for removal based on the fact that they are in this process or not? Your Honor, I don't think it's based on the fact. Of course, that's a discoverable issue, that's a fact issue. The only thing, as Your Honor pointed out, that the government conceded to is that we make, that ICE is making, right? I agree. The reason I'm asking the question is I don't understand the government to have made any concessions that go to that in this case. So I was just asking whether you are in a position to just answer the question. Frankly, Your Honor, ICE doesn't know when they went to go pick up these I-130 applicants about the provisional waiver process. They were able to arrest them in an I-130 interview. It's a safe place to arrest an alien where they don't have any sort of outside factors that may put the officer's safety at risk. It didn't have anything to do with the provisional waiver process. That's what I believe, but that's a fact issue, and the government, importantly, did not concede that there was this conspiracy, as plaintiffs make it out, that we're going to arrest all these people and nullify the provisional waiver regulations. No. ICE was just taking enforcement actions when and where it could, and it happened to be that some people who were class members got arrested at I-130 interviews. USCIS didn't ignore their I-130 application. They adjudicated the I-130 application. But again, if that's the issue that this court finds, we've got a massive problem with the scope of the injunction. The scope of the injunction allows people so close to this nation's capital who are dangerous criminals to perpetually file I-130s and get out of ICE enforcement action. That is not related to the text of the regulation, so we would ask that this court reverse and vacate. All right. Thank you very much. We normally come down and shake hands with you so that all of the disputes are resolved in the handshake. This is the tradition of the Fourth Circuit, and then we write on a clean slate to try to resolve the issues. We thank you both for your arguments. We can't shake hands with you today except virtually, and we do so, and thank you for your arguments. And we'll take a short recess at this point. The clerk will adjourn court temporarily.
judges: Paul V. Niemeyer, Robert B. King, Pamela A. Harris